IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARTIN H. SCHNEKENBURGER, a minor by his mother and next best friend CYNTHIA D. SCHNEKENBURGER, | ) ) ) ) | |
| Plaintiff, | ) ) | 12-cv-5873 |
| v. | ) ) | Judge John Z. Lee |
| OFFICER CARL MESSINA, individually; OFFICER BRIAN MARTORANO, individually; and the VILLAGE OF WHEELING, a municipal corporation, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Martin Schnekenburger ("Schnekenburger") was duped by a friend into driving a stranger's car without the owner's consent. He returned the keys as soon as he learned of his mistake, but fled the scene when the understandably perturbed owner called the police. Defendants Officer Carl Messina and Officer Brian Martorano responded to the call. Messina eventually found Schnekenburger hiding in the bushes of a nearby house. A standoff ensued, and Messina deployed his taser against Schnekenburger twice.[1] Messina's use of his taser is the crux of this lawsuit. Schnekenburger asserts claims under 18 U.S.C. § 1983 against Messina for use of excessive force and against Martorano for failure to intervene.

---

[1] "Taser" is a registered trademark. *See* Trademark Notice, https://www.taser.com/legal/trademark-notice (last accessed July 6, 2015). Nevertheless, for purposes of this Memorandum Opinion and Order, the Court will employ the lowercase form. *See, e.g.*, *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706 (7th Cir. 2013).

He also asserts state law claims of battery against the officers and Defendant Village of Wheeling.

Defendants have moved for summary judgment on the basis of the qualified immunity doctrine. Defendants argue that given the circumstances – an alleged car thief who was hiding in deep bushes, ignoring orders to come out, and otherwise resisting arrest – no reasonable jury could find Messine'a use of his taser constitutionally suspect. Defendants also argue that no reasonable jury could find that Martorano had an opportunity to intervene and prevent the second taser strike. Finally, Defendants move for summary judgment on the state law battery claim, citing the Illinois' Local Government Employees Tort Immunity Act, 745 Ill. Comp. Stat. 10/1-101 *et seq.*

For the reasons provided herein, Defendants' motion is granted in part and denied in part. The Court concludes that the doctrine of qualified immunity applies to Martorano, and Plaintiff's section 1983 failure to intervene claim and state law claim against Martorano are dismissed. The Court further concludes that Messina's first discharge of his taser falls within the scope of the qualified immunity doctrine, but that the second discharge does not. Finally, the Court denies summary judgment as to Plaintiff's state law claim against Messina and the Village of Wheeling.

# Factual Background[2]

## A.     Schnekenburger Joyrides and Flees

On June 12, 2011, Martin Schnekenburger's friend, Eduardo, asked Schnekenburger to move his mother's car down the street and gave him a set of keys to the car.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 7; *see also* Defs.' LR 56.1(a)(3) Stmt., Ex. 3 (Schnekenburger Dep. 11:15; 14:1–3, Apr. 15, 2013).   Because he was only fifteen years old, Schnekenburger did not have a driver's license at the time. *See* Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 8; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6.

Nonetheless, Schnekenburger drove the car down the street and parked it, at which point the car's actual owner (who, as fate would have it, was not Eduardo's mother) began chasing Schnekenburger down the street and yelling at Schnekenburger that he was stealing his car.  *See* Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 8; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 3.  At this point, Schnekenburger stopped the car and gave the keys back to the owner.  *See* Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 8.  With that, it is undisputed that Schnekenburger had entered and driven a car that he did not own and did not have permission to drive.  *See* Defs.' LR 56.1(b)(3)(B) Stmt. ¶¶ 1, 7; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 6.

---

[2]     The following facts are undisputed unless otherwise noted.  Additionally, the Court notes that Defendants have filed a Motion to Strike, arguing that many of Plaintiff's responses to their Local Rule 56.1(a)(3) Statement are argumentative or do not cite to supporting evidence in the record.  *See generally* Defs.' Mot. Strike.   These general objections are dealt with as a matter of course in the Court's evaluation of the parties Local Rule statements.  The more specific arguments concerning expert testimony, hearsay, and purported contradictions between pleadings and deposition testimony are addressed herein.

The owner then told Schnekenburger he was calling the police. *See* Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 8. Schnekenburger panicked and fled the scene. *See id.* ¶ 12; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 12.

True to his word, the car owner called the police, and a dispatch call went out over the police radio requesting help in locating a suspected car thief who had fled the scene. *See* Defs.' LR 56.1(a)(3) ¶ 13. The officers were informed that the suspect had fled on foot and his whereabouts were unknown. *See id.* ¶ 15. Messina responded to the call and went to assist in the search for Schnekenburger. *See id.* ¶ 14.

After fleeing from the scene, Schnekenenburger hid in a clump of bushes by a house. *See id.* ¶ 16. The amount of time Schnekenburger hid in the bushes until he was discovered is disputed. Defendants believe that about an hour had passed before Messina located Schnekenburger. *See id.* ¶ 17. But, as Schnekenburger points out, Messina was not so sure himself, initially testifying that the search took forty minutes, then later testifying that it took only fifteen to twenty minutes. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17.

The parties also dispute how far Schnekenburger was hiding in the bushes. Defendants believe that Schnekenburger was deep in the bushes and sufficiently concealed so that Messina passed by several times without seeing Schnekenburger. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 18. Schnekenburger does not dispute that Officer Messina passed by the bushes several times without discovering him, but remembers being only "a little bit" in the bushes and visible from outside the bushes

from a "straight shot" angle. *See* Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 18. A neighbor finally alerted Officer Messina that Schnekenburger was hiding in the bushes. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 19.

### B.      Standoff in the Bushes

After finding Schnekenburger, Messina ordered him to come out. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 20. Schnekenburger heard and understood Messina's orders. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 21. The parties dispute, however, whether Messina also ordered Schnekenburger to show his hands. Messina believes that he did give such an order; Schnekenburger believes that Messina did not because his hands were already visible. *See* Defs.' LR 56.1(b)(3)(B) ¶ 20; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 20.

What follows is also disputed. According to Messina, after he admonished Schnekenburger to "come out," Schnekenburger swore at him and verbally and physically refused to come out of the bushes. As a result, Officer Messina was forced to reach in order to grab Schnekenburger as he retreated backwards. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 22–24. Messina remembered that he had only a physical description of Schnekenburger at the time, that he could not see Schnekenburger's hands while in the bushes, and that he did not know if Schnekenburger had a gun or other weapon in his possession or immediately nearby. *See id.* ¶¶ 24–27. Messina believed that Schnekenburger could retreat further into the bushes and feared for his own safety. *See id.* ¶¶ 29–30.

Schnekenburger's recollection differs substantially. According to Schnekenburger, he did not swear at or verbally talk back to Officer Messina. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22.[3] Schnekenburger further testified that Officer Messina never reached in to grab him and that he could not retreat backwards into the bushes because he was already as far back as he could go. *See id.* ¶¶ 23–24.

Schnekenburger also stated that, because he was sitting in a pretzel-like position, his hands were visible throughout the entire encounter and Officer Messina could see that Schnekenburger did not have a weapon. *See id.* ¶ 25, 27. This, combined with the fact that Messina had a bullet proof vest and a handgun, leads Schnekenburger to question whether Messina had actually felt threatened or unsafe. *See id.* ¶¶ 28; 30. Plaintiff also claims that he was hemmed in by branches and a house and argues Messina's stated belief that Schnekenburger could retreat further in the bushes is not credible. *See id.* ¶¶ 26, 29.

That said, the parties do not dispute that Messina warned Schnekenburger that Messina would fire his taser at him if he did not come out of the bushes. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 31.

---

[3] Defendants also cite to the declaration of Sergeant Joseph Licari to establish the facts leading up to the first taser strike. *See* Defs.' LR 56.1(a)(3) Stmt., Ex. 5, Licari Decl. Schnekenburger challenges Licari's statements on the grounds that they are inadmissible hearsay because they only paraphrase Schnekenburger's statements. Schnekenburger cites to *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008), in support of this argument. But *Judson* examined the proper foundation for a summary of voluminous records offered under Federal Rule of Evidence 1006. *Judson* is not applicable here. Moreover, as Defendants point out, Schnekenburger's statements to Licari are the admissions of a party opponent under Federal Rule of Evidence 801(d)(2)(a). *See Fenje v. Feld*, 301 F. Supp. 2d 781, 811 (N.D. Ill. 2003), *aff'd*, 398 F.3d 620 (7th Cir. 2005). Consequently, Plaintiff's request that the Court strike Licari's declaration is denied.

## C.     The First Taser Strike

Messina received his certification to use his taser on June 12, 2011.  *See id.*

¶¶ 42, 47.  The taser in question shoots out two prongs, which send approximately

.0036 amps of electricity through the body of the subject for five second cycles.  *See*

*id.* ¶¶ 43–44.[4]  This electricity results in neuromuscular incapacitation which

inhibits voluntary movement.  *See id.* ¶ 45.[5]

A short time after giving Schnekenburger a warning, Messina "painted"

Schnekenbuger with his taser light.  *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 32.[6]  At the

time Messina "painted" Schnekenburger, Messina believed that Schnekenburger

was still actively refusing to come out of the bushes.  *See id.* ¶ 34.  Schnekenburger

disputes this characterization and claims that he was passively sitting in the

bushes, not saying anything.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 34.  In any case,

---

[4]     Schnekenburger objects to the information concerning the amount of electricity discharged by the taser.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 43.  Schnekenburger, however, does not properly challenge the experts' qualifications or opinions under *Daubert*.  Instead, he again relies on *Judson Atkinson Candies, Inc.*, 529 F.3d at 382 (7th Cir. 2008), to challenge the evidence in a conclusory fashion.  Where, as here, a party has not filed a formal motion to strike or provided substantive arguments challenging the admissibility of expert testimony, the Court can assume that the opinions of the experts are correct, adjudicate a summary judgment motion accordingly, and leave the admissibility question for later stage in the proceedings.  *See, e.g.*, *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, No. 11-CV-6771, 2014 WL 1227311, at *6 (N.D. Ill. Mar. 25, 2014).

[5]     The extent of this incapacitation is disputed. Defendants assert that, upon conclusion of the five-second cycle, the target regains complete muscle control. On the other hand, Schnekenburger claims that a taser can have different effects on different individuals based upon a number of physical variables.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 46 (citing Messina Dep. 37:23–24; 38:1–16, June 11, 2013).

[6]     "Painting" a person means pointing a light from the taser at a person, which indicates to the person that the safety "off" and a taser strike is forthcoming.  *See id.* ¶ 33.

Officer Messina deployed his taser against Schnekenburger in dart mode. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 35–36.

### D. The Second Taser Strike

The impact of the first taser strike on Schnekenburger is disputed. Defendants assert that, after being struck with the taser prongs, Schnekenburger fell forward, and part of his body fell out of the bushes. Messina then pulled him out. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 48–49. According to Defendants, once Schnekenburger was pulled out of the bushes, he was lying on his back when Martano arrived on the scene. *See id.* ¶ 49. In contrast, Schnekenburger claimed at his deposition that, after he was struck with the taser strike, he came out of the bushes on his own accord and was never fully on his back. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 48–50.[7] Both sides agree that Schnekenburger was able to move after the first taser strike; however, Schnekenburger claims that his movement was involuntary. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 51; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 51.

The events leading up to the second taser strike are also contested. According to Defendants, both Messina and Martorano commanded

---

[7] Defendants request that the Court strike Schnekenburger's deposition testimony because it contradicts his Second Amended Complaint, where he alleged that he was on his "lying on his back in a helpless position" after the first taser strike. *See* Pl.'s 2d Am. Compl. ¶ 12. Defendants argue that Schnekenburger cannot contradict his pleading through his deposition testimony, citing *Nuzzi v. St. George Community Consolidated School District No. 258*, 688 F. Supp. 2d 815, 840 (C.D. Ill. 2010). This request is denied. First, the court in *Nuzzi* did not strike the statements because of inconsistency, but because they were unsubstantiated and thus could not create genuine disputes of material fact. *See id.* (noting "a plaintiff's unsubstantiated statement that he or she is entitled to vacation pay is not sufficient to raise a genuine issue of material fact on that issue."). Moreover, although there may be some tension between Paragraph 12 of the Second Amended Complaint and Schnekenburger's later deposition testimony, the general point that Schnekenburger was lying helpless on the ground after the first taser strike has not changed.

Schnekenburger to roll on his stomach and put his hands behind his back. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 52. Defendants further claim that, when Martorano' tried to shift Schnekenburger onto his stomach, he resisted by physically shifting his weight away from Martorano and pulling his arm away. *See id.* ¶ 53. According to Schnekenburger, he was never told to roll on his stomach and put his hands behind his back *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 52–53. He claims that he voluntarily put his hands behind his back and never pulled away from Martorano. *See id.* ¶ 54.

The parties do agree that Schnekenburger was still connected to the taser wires as this was happening. Messina then discharged his taser a second time, sending another five-second charge through Schnekenburger's body. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 56–57. The duration of time between the two taser deployments is another matter of dispute. Defendants assert that only three seconds elapsed. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 61. Schnekenburger asserts that the time between the first tasing and the second tasking was eight seconds. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 61. After the second strike, Schnekenburger complied *See id.* ¶ 60; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 60.

### E. Officer Martorano's Actions

Like Messina, Martorano heard the police radio call and began driving around the neighborhood looking for the suspect. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 62–63. At some point, Martorano exited his car and began searching on foot. *See id.* ¶ 64. After about thirty minutes, he heard Messina yelling commands at

Schnekenburger, at which point Martorano ran to assist his fellow officer.  *See id.* ¶¶ 64, 65.

According to Defendants, when Martorano came around the corner of the houses near the bushes where Messina and Schnekenburger were located, he saw Messina pulling Schnekenburger out of the bushes.  *See id.* ¶ 66.  For his part, Schnekenburger claims again that he left the bushes voluntary.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 66.

Whether Martorano actually saw the first taser strike is contested. Martorano stated that he did not.  *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 67. Schnekenburger testified that  Martorano was present during, and possibly before, the first strike.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 67.  In any event, Schnekenburger did not see Martorano until Schnekenburger came out of the bushes.  *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 68.

What is undisputed is that Messina did not tell Martorano that he was planning to discharge his taser again, and Martorano had no way of knowing that he would do so.  *See id.* ¶¶ 70–71.  Schnekenburger testified that he felt afraid of Martorano and that Martorano made rude comments toward him and threatened to strike him with the taser again.  *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 74.  On the other hand, Martorano stated he took no action to place Schnekenburger in fear nor did he threaten him.  *See id.*  The parties agree that Martorano never pointed a taser at Schnekenburger.  *See id.* ¶ 76.

# Legal Standard

## A.     Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP,* 719 F.3d 785, 794 (7th Cir. 2013).  In order to survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and instead "must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.,* 674 F.3d 769, 772–73 (7th Cir.2012).  The Court will, however, "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statements." *Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 529 (7th Cir. 2000).

## B.     Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013).  "This involves two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the

defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011). "Courts may exercise discretion in deciding which question to address first." *Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir. 2013). "The plaintiff carries the burden of defeating the qualified immunity defense." *Rabin*, 725 F.3d at 632.

## Analysis

### A.    Excessive Force Claims

The legal framework for analyzing excessive force claims is well-established. In making an arrest, a police officer's action "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. O'Connor*, 490 U.S. 386, 396 (1989). "Excessive-force claims in the context of an arrest are reviewed under the Fourth Amendment's objective-reasonableness standard." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 861 (7th Cir. 2010).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 397. A court considers several factors in evaluating the reasonableness of a use of force: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Messina deployed his taser twice. Each use constitutes a separate use of force, and the Court will evaluate each taser strike separately for the purposes of the qualified immunity analysis. *See generally Abbott v. Sangamon Cnty., Ill.,* 705 F.3d 706 (7th Cir. 2013) (delineating analysis between first and second taser strike); *see also Schneider v. Love*, No. 09 C 3105, 2011 WL 635582 (N.D. Ill. Feb. 10, 2011) (granting summary judgment on first use of a taser but denying as to successive use of a taser).

### 1. First Taser Strike

With the above standards in mind, the Court turns to Officer Messina's first use of his taser. Although the two-part test for qualified immunity typically begins with a determination of whether the defendant violated a constitutional right, courts may start with an analysis of the second prong and "consider first whether the right is clearly established if doing so will conserve judicial resources." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). The Court embarks on this course here.

The second prong asks whether the constitutional right in question was clearly established at the time of the alleged violation. "It is the plaintiff's burden to demonstrate the existence of a clearly established constitutional right." *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). *See Findlay*, 722 F.3d at 899 ("Even when a public official's actions have violated a plaintiff's constitutional rights, the official can escape liability if the right was not clearly established at the time of the violation."). Schnekenburger "can carry this burden either by identifying a 'closely

analogous case that established a right to be free from the type of force the police officers used on him' or by showing 'that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'" *Id.* (quoting *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008)). "[A] case directly on point is not required for a right to be clearly established and officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Abbott*, 705 F.3d at 731 (citations and internal quotations omitted).

Within the framework of this inquiry, how the right is defined is important and often may be dispositive. Defining a right too broadly would eviscerate the doctrine of qualified immunity because the broader the right, the more likely it is to be clearly established in the law. On the other hand, defining the right too narrowly and with too much particularity would undermine the purpose of section 1983 because the more particular and fact-specific the right, the less likely it is to be clearly established. *See Abbott*, 705 F.3d at 723. In the end, the Court must strike a balance between the two, *id.*, and "the right must be clearly established in a particularized sense, rather than in an abstract or general sense." *Id.* at 731.

Looking to the facts of this case, the Court notes that a taser is "generally nonlethal" and "does not constitute as much force as so-called impact weapons, such as baton launchers and beanbag projectiles. *Id.* at 726. It is, however more than a *de minimis* use of force. *Id.* A taser therefore "falls somewhere in the middle of the nonlethal force spectrum." *Id.* That said, use of a taser as a projectile weapon in

"dart mode" — the manner in which Officer Messina employed his taser initially — intrudes on a suspect's "physiological functions and physical integrity in a way that other nonlethal force techniques do not." *Id.* (internal quotations omitted). With this in mind, the Court defines the right in question to be the right of a suspect resisting arrest in an active, but nonviolent manner, to be free of an officer's use of incapacitating force.

With respect to the first laser strike, Schnekenburger has not met his burden to demonstrate that the law was clearly established as to this right. In support, Schnekenburger offers a series of cases from other circuits concerning the use of tasers. *See* Pl.'s Mem. Opp'n 9–10. But cases from outside the Seventh Circuit are not particularly helpful. *See Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010) ("[W]hen looking at closely analogous cases to determine if a right was clearly established at the time of the violation, we look first to controlling precedent on the issue from the Supreme Court and to precedent from this Circuit."). The lone Seventh Circuit case cited by Schnekenburger is *Abbott v. Sangamon County, Ill.*, 705 F.3d 706 (7th Cir. 2013). *Abbott*, however, was decided two years after the incidents in this case and cannot be used to show that the law was clearly established at the time of the incident. *See Cygnar v. City of Chi.*, 865 F.2d 827, 846 (7th Cir. 1989) (examining only cases decided before the events at issue in analyzing how clearly established the law was for qualified immunity). That said, Schnekenburger can rely upon the cases cited in *Abbott*, to the extent that they were decided prior to the events in dispute here. *Cf. Findlay*, 722 F. 3d at 900

(noting that an otherwise time-barred case might be analyzed for its internal citations to pre-incident cases clearly establishing the rights at issue).

Turning to the cases decided pre-incident, it was clearly established by June 12, 2011, that the use of a taser against a non-resisting or passively resisting suspect constitutes excessive force. *See Abbott*, 705 F.3d at 726 (citing *Morfin v. City of Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003); *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996); *Rambo v. Daley,* 68 F.3d 203, 207 (7th Cir. 1995)). But in all of these cases, the suspect engaged in what can only be described as minimal resistance, if at all. *See Morfin*, 349 F.3d at 1005 (suspect was "docile and cooperative" and "did not resist arrest in any way prior to the officers' use of excessive force"); *Payne*, 337 F.3d at 774 (7th Cir. 2003) (suspect "did not argue back, did not swear, and did not raise her voice" but merely told the officer "that his comments about African Americans were not true"); *Clash*, 77 F.3d at 1047 (suspect was "already handcuffed," was "unarmed," and merely protested that he did not think he could "fit into" the squad car and asked to get in himself); *Rambo*, 68 F.3d at 207 (excessive force to fracture suspect's ribs when he was merely protesting police jurisdictional authority). This was not the case here. In this case, it is undisputed that at the time of the first taser strike, Messina knew that: Schnekenburger was a suspected car thief; he had fled the scene to escape capture; he was hiding in bushes in a confined space and was crouched deep enough in the bushes that he had gone unnoticed by Messina when

he had passed by earlier; and Schnekenburger refused to obey Officer Messina's orders to exist the bushes, even when the officer had pointed a taser at him.

On the other hand, in cases more analogous to this one, the Seventh Circuit has found the officers' actions to be reasonable. In *Clarett v. Roberts*, 657 F.3d 664, 674–675 (7th Cir. 2011), for example, the Court upheld an officer's use of a taser against a subject who was standing in a doorway blocking a bedroom and who refused to move after repeated calls from the officer to do so. In that case, the Seventh Circuit noted that the officer had considered alternatives to the taser but, because the space was small and crowded, he had feared that the situation would escalate. *See id.* at 675.

Another example is *United States v. Norris*, 640 F.3d 295 (7th Cir. 2011). In *Norris*, the Seventh Circuit upheld an officer's use of a taser where the suspect fled up some steps, concealed his hands, and did not comply with orders to descend the steps and display his hands. *See id.* at 303. In yet another case*,* the Seventh Circuit held that the use of taser against a uncooperative suspect within the confined space of a jail cell was not excessive. *See Forrest v. Prine,* 620 F.3d 739, 745–46 (7th Cir. 2010). And at least one district court in this district found an officer's use of a taser reasonable where the suspect was ignoring verbal commands and fleeing. *See Kasey v. McCulloh*, No. 09 C 1957, 2011 WL 1706092, at *5 (N.D. Ill. May 5, 2011).

Here, Schnekenburger was not actively resisting in the sense of displaying verbal aggression or threatening behavior, or engaging in a physical struggle. But

Schnekenburger's actions in fleeing, hiding, and refusing to come out of a confined space, even in the face of a possible taser strike, present a factual scenario different from the passive resistance presented in *Morfin, Payne,* and *Clash*, and more akin to the facts in *Clarett, Norris,* and *Forrest*. At a minimum, the presence of these latter cases demonstrates that a reasonable officer in Officer Messina's shoes would not have clearly known that the use of a taser against Schnekenburger under the conditions here would have constituted excessive force.

Alternatively, Schnekenburger suggests that Officer Messina's first taser strike was so plainly excessive that reliance upon similar cases is unnecessary. *See* Pl.'s Mem. Opp'n 5. *See Findlay*, 722 F.3d at 899 (plaintiff can show that the law was clearly established by demonstrating that the force was plainly excessive). But the summary judgment record does not support this contention.

First, even assuming all the facts in Schnekenburger's favor, Officer Messina had reason to be concerned for his safety. He knew that Schnekenburger was suspected of stealing a car; he knew that Schnekenbruger had fled to evade capture and arrest; Schnekenburger was burrowed deep enough in the bushes that Messina could not see him when he had passed by earlier; Schnekenburger was in a confined space and refused to obey Messina's commands to come out; Messina did not know whether Schnekenburger had a weapon in his immediate vicinity. No reasonable jury could find from this record that Officer Messina's use of his taser was "so plainly excessive that no analogous case is needed." *Weinmann v. McClone*, --- F.3d ----, No. 14-1794, 2015 WL 3396858, at *6 (7th Cir. May 27, 2015).

Because Schnekenburger has not met his burden to show that the law was clearly established by June 12, 2011, that Officer Messina's initial use of his taser would have violated Schnekenburger's constitutional rights, Officer Messina is entitled to qualified immunity with respect to the first use.

### 2. Second Taser Strike

Turning to Messina's second use of his taser, in the Seventh Circuit, "[i]t is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders . . . . But that principle depends critically on the fact that the suspect is indeed subdued." *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). Put differently, "[f]orce is reasonable only when exercised in proportion to the threat posed . . . and as the threat changes, so too should the degree of force[.]" *Cyrus*, 624 F.3d 856, 863 (7th Cir. 2010) (examining repeated taser strikes). "Force also becomes increasingly severe the more often it is used . . . . Accordingly, a jury might reasonably conclude that the circumstances of [an] encounter . . . reduced the need for force as the situation progressed." *Id.*

Here, a jury could reasonably conclude, taking the facts in the light most favorable to Schnekenburger, that Officer Messina's second use of his taser violated the Fourth Amendment. It is undisputed that, after the first taser strike, Schnekenburger was out of the bushes and lying on the ground. *See* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 48–49. Although Schnekenburger's precise body position and the extent of his cooperation is disputed, *compare* Defs.' LR 56.1(a)(3) Stmt. Ex. 3 (Schnekenburger Dep. 39:7–19; 41:11–18); *id.*, Ex. 4 (Messina Dep. 39:10–16; 40:11–

19), at most, only eight seconds passed between the first and second firings. "Whether the subsequent use of the taser was excessive depends on which version of events is credited." *Kasey*, 2011 WL 1706092, at *5. From this record, a reasonable jury could find that any threat Schnekenburger continued to pose to the officers did not justify a second taser strike.

Indeed, viewing the facts in Schnekenberger's favor, at the time that Messina deployed his taser a second time, Schnekenburger had only just been stunned and lying on the ground. He was cooperating with the officers to the extent he could, going so far as to voluntarily putting his hands behind his back. "[I]t was well-established in 2007 that police officers cannot continue to use force once a suspect is subdued." *Abbott*, 705 F.3d at 732 (citing *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001)).

There is a genuine issue of material fact as to whether Schnekenburger was complying with the officers after the first taser strike and before the second strike. Furthermore, as discussed above, the law in the Seventh Circuit was clearly established that the use of a taser on a non-resisting and compliant individual is a violation of the individual's constitutional rights. Accordingly, Defendants' motion for summary judgment is denied as to Messina's second use of his taser.

### B.  Failure to Intervene

Martorano also moves for summary judgment under qualified immunity on the failure to intervene claim. "Omissions as well as actions may violate civil rights." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). "[U]nder certain

circumstances a state actor's failure to intervene renders him or her culpable under § 1983." *Id.* Generally, "it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang*, 37 F.3d at 285 (emphasis in original).

Put another way, "police officers who have a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but fail to do so" are liable under section 1983. *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). A "realistic opportunity" to intervene "may exist whenever an officer could have called for a backup, called for help, or at least cautioned the excessive force defendant to stop." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (internal quotations and alterations omitted). That said, "[w]hether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly

conclude otherwise." *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997); *see also Rainey v. City of Chi.*, No. 10 C 07506, 2013 WL 941968, at *7 (N.D. Ill. Mar. 11, 2013) ("A claim of failure to intervene almost always implicates questions of fact for the jury.").

First, with respect to the first taser strike, even when the facts are construed in Plaintiff's favor, many of the same reasons that support qualified immunity for Officer Messina also apply to Officer Martorano. Martorano knew that Schnekenburger was a suspected car thief, that he had run from the scene to evade capture, and that he was hiding in the bushes when he was confronted with Officer Messina. Accordingly, Officer Martorano is granted qualified immunity with respect to Messina's first use of his taser.

As for Messina's second taser strike, the Court concludes that no reasonable jury would find that Officer Martorano had sufficient time to intervene or a realistic opportunity to prevent Officer Messina from striking Schnekenburger the second time. Schnekenburger identifies no facts from which Martorano could have known that Messina would use his taser a second time. In fact, it is undisputed that Messina did not communicate to Martorano that he was going to strike Schnekenburger a second time. *See* Defs.' 56.1(a)(3) Stmt. ¶ 70. And, even assuming that Martorano knew Messina had already used a taser — a reasonable assumption given that the wires were still attached to Plaintiff's body — this, by itself, does not mean that Martorano had reason to believe that Messina would strike again only seconds later. *Cf. Pullen v. House,* --- F. Supp. 3d ----, No. 13-CV-

827-BBC, 2015 WL 736679, at *17 (W.D. Wis. Feb. 20, 2015) (defendant officer had a chance to warn another officer not to *initially* tase a subject where the defendant officer saw his fellow officer *draw* his taser, *release* his hold on the plaintiff, and then deploy the taser).

In response, Schnekenburger argues that Martorano should have known that a second taser strike was forthcoming given that he witnessed the first strike. But such speculation is unpersuasive. *See, e.g., Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (speculation and hunches not enough to defeat summary judgment in the face of evidence to the contrary).

Next, Schnekenburger shifts tactics and cites to *Torres-Rivera v. O'Neil-Cancel*, 406 F.3d 43 (1st Cir. 2005), and asks this Court to adopt a joint tortfeasor liability theory. Schnekenburger, however, does not cite to any Seventh Circuit or Supreme Court authority to support his theory, and *Torres-Rivera* is not binding. And even if it were, the facts in that case are readily distinguishable. In *Torres*, the offending officer beat the plaintiff repeatedly for a significant length of time while the defendant officer stood by. *Id.* at 52. Here, even by Schnekenburger's own account, Martorano had no chance to intervene, and summary judgment is granted as to the failure to intervene claim against Officer Martorano.

## B.     State Law Battery Claim

The two officers also request summary judgment as to the state law battery claim, citing the Local Government Employees Tort Immunity Act ("Tort Immunity Act"), 745 Ill. Comp. Stat. 10/1-101 *et seq.* Under the Tort Immunity Act, "[a] public

employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 Ill. Comp. Stat. Ann. 10/2-202. "Willful and wanton conduct" is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1–210.

"The Illinois courts have held that a police officer is not guilty of willful or wanton conduct unless he acted with 'actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others.'" *Chelios*, 520 F.3d at 693 (quoting *Breck v. Cortez*, 490 N.E.2d 88, 94 (Ill. App. Ct. 1986)). "Although willful and wanton conduct 'consists of more than mere inadvertence, incompetence, or unskillfulness,' it need not be an 'intentional act; rather, it may be an act committed under circumstances exhibiting a reckless disregard for the safety of others.'" *Id.* (quoting *Carter v. Chi. Police Officers*, 165 F.3d 1071, 1071 (7th Cir. 1998)).

Defendants first argue that Schnekenburger admitted in his answers to Defendants' affirmative defenses that "willful and wanton conduct has not been alleged in the Second Amended Complaint." *See* Def.'s LR 56.1(a)(3) Stmt., Ex. 9, ¶7. However, this is a legal conclusion and not a factual admission; therefore, it is not binding as a judicial admission. *See Dabertin v. HCR Manor Care, Inc.*, 68 F. Supp. 2d 998, 1000 (N.D. Ill. 1999) ("As a general rule, factual admissions are

binding on a party as a judicial admission unless withdrawn or amended . . . . Counsel's legal conclusions, however, are not binding as judicial admissions.").

Defendants also argue that the record is devoid of any facts to support the conclusion that the officers acted in a willful and wanton manner. As for Martorono for the reasons already discussed, there is no evidence from which a reasonable jury could conclude that he violated the Fourth Amendment at all, let alone in a willful and wanton manner. *See DeLuna v. City of Rockford, Ill.,* 447 F.3d 1008, 1013 (7th Cir. 2006) (finding that, where a plaintiff "seeks a determination that conduct which is a reasonable response under the Fourth Amendment nevertheless can constitute willful and wanton conduct under state law[,] . . . . The difficulties of such a quest are apparent."). Accordingly, the Illinois Tort Immunity Act operates to bar the state law claim against Martorano.

As for Messina, for the reasons discussed, the Court concludes that there is no evidence from which a reasonable jury could conclude that he acted with the "actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others" when he deployed his taser the first time. *Chelios*, 520 F.3d at 693. Even when the record is construed in Plaintiff's favor, Messina's fear for his own safety before he deployed his taser the first time was not entirely unreasonable under the circumstances, and he was not aware that using his taser in that situation would violate Schnekenburger's constitutional rights. As for the second discharge of the taser, however, viewing the facts in the light most favorable to Schnekenburger, a reasonable jury could conclude that Messina

intended to harm Schnekenburger. A taser, while not a gun, does constitute a painful application of force. And Officer Messina deployed the taser against Schnekenburger when he was already compliant and essentially defenseless (at least according to Plaintiff). Of course, a reasonable jury could conclude otherwise, but this is exactly what precludes summary judgment. *See, e.g.*, *Thurman v. Vill. of Hazel Crest*, 570 F. Supp. 2d 1019, 1028–29 (N.D. Ill. 2008) (denying summary judgment based on the Illinois Tort Immunity Act and noting that because "the facts regarding the force used against [the plaintiff] and the surrounding circumstances are disputed" the court could not determine on summary judgment "whether the conduct was willful and wanton.").

Lastly, under Illinois law, a municipality such as the Village of Wheeling may be held liable for battery and other willful and wanton tortious acts committed by its police officers in the course of their duties. *See Sanchez v. City of Chi.*, 700 F.3d 919, 926–27 (7th Cir. 2012) (citing 745 Ill. Comp. Stat. 10/2-202). Because Plaintiff's state law claim against Messina with respect to the second use of the taser must go to trial, the Village of Wheeling too must remain as a defendant in this case.

## Conclusion

For the reasons provided, Defendants' motion for summary judgment [82] is granted in part and denied in part. Officer Messina is entitled to qualified immunity with respect to the first use of his taser, but not the second. The Court extends qualified immunity to Martorano for the failure to intervene claim as to

both incidents. Similarly, the Illinois Tort Immunity Act extends immunity to Messina for the first use of his taser, but not the second; immunity is extended to Martorano for both. The Village of Wheeling's motion for summary judgment is denied, and Defendant's motion to strike [95] is stricken as moot.

**SO ORDERED**                    **ENTER:  9/25/15**

_____

**JOHN Z. LEE**
**United States District Judge**